# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| Collective Edge LLC, <br><br> and <br><br> Ferg's Sports Bar & Grill, Inc., <br><br> and <br><br> Carlos Lopez, Jr. and Colleen A. Lopez <br><br> *Plaintiffs*, <br><br> v. <br><br> United States of America, <br><br> *Defendant*. | Consolidated <br> Case Nos. 20-34, 20-48, and 20-159 <br><br> Judge Armando O. Bonilla |

**UNITED STATES' MOTION FOR RECONSIDERATION OF LIABILITY DECISION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

BACKGROUND ............................................................................................................................ 1

    I.    Legal Background ............................................................................................ 1

    II.    Relevant Procedural History .......................................................................... 3

STANDARD OF REVIEW ............................................................................................................ 5

ARGUMENT .................................................................................................................................. 6

    I.    A NITU Is the Only Government Action That Can Provide the Basis for a Taking Claim in Trails Act Cases .......................................................... 7

    II.    Any Taking Based on the 2020 NITU Is—At Most—Temporary ......................... 9

    III.    No Taking Claim Based on the 2024 NITU Is Before the Court and any such Claim Would be Temporary in Nature in any Event ................................... 11

    IV.    The Distinction Between Temporary and Permanent Takings Has Significant Ramifications for the Court's Just Compensation Analysis ............... 12

CONCLUSION ............................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Balagna v. United States,*
  138 Fed. Cl. 398 (2018) .................................................................................................. 8

*Balagna v. United States,*
  145 Fed. Cl. 442 (2019) .................................................................................................. 8

*Barclay v. United States,*
  443 F.3d 1368 (Fed. Cir. 2006) ............................................................................. 1, 2, 8

*Bauman v. Ross,*
  167 U.S. 548 (1897) ..................................................................................................... 12

*Boise Cascade Corp. v. United States,*
  296 F.3d 1339 (Fed. Cir. 2002) ..................................................................................... 9

*Caldwell v. United States,*
  391 F.3d 1226 (Fed. Cir. 2004) ............................................................... 2, 3, 7, 8, 9, 11

*Caquelin v. United States,*
  959 F.3d 1360 (Fed. Cir. 2020) ................................................................................... 11

*Chi. & Nw. Transp. Co. v. Kalo Brick & Tile Co.,*
  450 U.S. 311 (1981) ................................................................................................ 1, 11

*Colorado v. United States,*
  271 U.S. 153 (1926) ....................................................................................................... 1

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County,*
  482 U.S. 304 (1987) ..................................................................................... 7, 9, 10, 13

*Fla. Power & Light Co. v. United States,*
  66 Fed. Cl. 93 (2005) ..................................................................................................... 6

*Gadsden Industrial Park, LLC v. United States,*
  956 F.3d 1362 (Fed. Cir. 2020) ................................................................................... 13

*Grantwood Vill. v. Mo. Pac. R.R.,*
  95 F.3d 654 (8th Cir. 1996) ........................................................................................... 2

*Hayfield N. R.R. v. Chi. & Nw. Transp. Co.,*
  467 U.S. 622 (1984) ....................................................................................................... 1

*Kirby Forest Indus., Inc. v. United States,*
  467 U.S. 1 (1984) ......................................................................................................... 10

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
  98 Fed. Cl. 45 (2011) ..................................................................................................... 6

*Ladd v. United States,*
  630 F.3d 1015 (Fed. Cir. 2010) ................................................................................. 7, 8

*Land Grantors in Henderson, Union & Webster Ctys. v. United States*,
   71 Fed. Cl. 614 (2006) .................................................................................................... 5

*Lowery v. United States*,
   167 Fed. Cl. 28 (2023) ..................................................................................................... 8

*Marconi Wireless Tel. Co. of Am. v. United States*,
   320 U.S. 1 (1943) ............................................................................................................ 5

*Martin v. United States*,
   101 Fed. Cl. 664 (2011) ................................................................................................... 6

*McGowan v. Sec'y of Health & Human Servs.*,
   31 Fed. Cl. 734 (1994) ..................................................................................................... 6

*Memmer v. United States*,
   50 F.4th 136 (Fed. Cir. 2022) ............................................................................... 8, 9, 11

*Potts v. Howard Univ. Hosp.*,
   623 F. Supp. 2d 68 (D.D.C. 2009) ................................................................................... 6

*Preseault v. ICC*,
   494 U.S. 1 (1990) .................................................................................................... 1, 2, 3

*RLTD Ry. Corp. v. Surface Transp. Bd.*,
   166 F.3d 808 (6th Cir. 1999) ........................................................................................... 2

*San Diego Gas & Electric Co.*,
   450 U.S. 621 (1981) ........................................................................................................ 9

*Seiber v. United States*,
   364 F.3d 1356 (Fed. Cir. 2004) ............................................................................. 7, 9, 10

*United States v. 50 Acres of Land*,
   469 U.S. 24 (1984) ......................................................................................................... 12

*United States v. Dow*,
   357 U.S. 17 (1958) ......................................................................................................... 10

*Wolfchild v. United States*,
   68 Fed. Cl. 779 (2005) ................................................................................................. 5, 6

*Wyatt v. United States*,
   271 F.3d 1090 (Fed. Cir. 2001) ............................................................................. 7, 9, 10

*Yuba Nat. Res., Inc. v. United States*,
   821 F.2d 638 (Fed. Cir. 1987) ....................................................................................... 12

*Yuba Nat. Res., Inc. v. United States*,
   904 F.2d 1577 (Fed. Cir. 1990) ..................................................................................... 12

**Statutes**

16 U.S.C. § 1247(d) ............................................................................................................... 2

16 U.S.C. §§ 1241-1251 ................................................................................................... 2

49 U.S.C. § 10903(a)(1) .................................................................................................... 1

49 U.S.C. § 10903(d)(1) .................................................................................................... 1

**Rules**

RCFC 54(b) ....................................................................................................................... 5

RCFC 59(a)(1)(C) ............................................................................................................. 5

**Regulations**

49 C.F.R. § 1152.29(d) ..................................................................................................... 2

49 C.F.R. § 1152.29(h) ..................................................................................................... 2

49 C.F.R. §1152.29I(2) ..................................................................................................... 3

**INTRODUCTION**

Pursuant to Rules 54(b) and 59(a)(1)(C) of the Rules of the United States Court of Federal Claims ("RCFC"), Defendant, the United States of America, moves the Court to reconsider its August 19, 2021 Opinion and Order, ECF No. 38, finding the United States liable for a permanent taking.

**BACKGROUND**

**I.      Legal Background**

The Surface Transportation Board ("STB") has plenary authority over the construction, operation, and abandonment of virtually all the nation's rail lines. *See Chi. & Nw. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 319-20 (1981). A railroad providing transportation services under the STB's jurisdiction cannot be relieved of its legal obligation to offer service on a particular rail line without first obtaining the STB's express consent. *See* 49 U.S.C. § 10903(a)(1); *Colorado v. United States*, 271 U.S. 153, 167 (1926); *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006).

The railroad's termination of active rail service generally occurs in several ways, two of which are relevant here. First, the railroad may seek permission to terminate its service over a corridor through an abandonment proceeding. *See* 49 U.S.C. § 10903(d)(1). If the STB grants the railroad authority to abandon, and the railroad "consummates" the abandonment, the rail line is removed from the national transportation system and the STB's jurisdiction ends. *See Preseault I*, 494 U.S. 1, 5 n.3 (1990); *Hayfield N. R.R. v. Chi. & Nw. Transp. Co.*, 467 U.S. 622, 633 (1984); *Barclay*, 443 F.3d at 1376 n.10 ("The STB retains jurisdiction over the right-of-way until the notice of consummation is filed."). When STB jurisdiction ends, federal preemption also ends and state real property law applies.

1

Second, as provided in the National Trails System Act, 16 U.S.C. §§ 1241-51 ("Trails Act"), in lieu of either abandonment of the line or discontinuance of service, railroads may seek to "railbank" their rail line. *See RLTD Ry. Corp. v. Surface Transp. Bd.*, 166 F.3d 808, 811 (6th Cir. 1999) ("Railbanking is an alternative to abandonment."); *Grantwood Vill. v. Mo. Pac. R.R.*, 95 F.3d 654, 659 (8th Cir. 1996) ("Congress determined that interim trail use was to be treated like discontinuance rather than as an abandonment."). Congress created railbanking "to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. § 1247(d).

Railbanking can only occur after a railroad has begun the STB's regulatory abandonment process. When a railroad seeks STB authorization to abandon common carrier service, a party interested in using the corridor as an interim public trail may request issuance of a Notice of Interim Trail Use or Abandonment ("NITU"). *See* 49 C.F.R. § 1152.29(d). When the STB issues a NITU (which can occur only with the railroad's consent), STB jurisdiction is preserved, thereby continuing the preemption of state law. *See Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004).

If a railbanking and interim trail use agreement is reached, the corridor is railbanked, the STB retains its jurisdiction, and "interim trail use is thereby authorized." *Preseault I*, 494 U.S. at 7 n.5; *see also* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(h). If no trail use agreement is reached, the NITU "converts into an effective notice of exemption" that authorizes the railroad to "abandon the line entirely and liquidate its interest." *Barclay,* 443 F.3d at 1371 (internal quotation and citation omitted). At that point, the railroad may take one of the three possible actions: (1) consummate abandonment, thereby ending the STB's jurisdiction and removing the

2

rail line from the national transportation system; (2) decline to consummate abandonment, thereby retaining the rail line; or (3) ask the STB to extend the time to consummate abandonment.  *See* 49 C.F.R. §1152.29I(2); *see also See Preseault I*, 494 U.S. at 7; *Caldwell*, 391 F.3d at 1230.

## II. Relevant Procedural History

The STB issued a NITU to CSX Transportation ("CSXT") and Georgetown and High Line Railway Company ("GHL") on January 10, 2020 (the "2020 NITU").  *See* STB Decision of Jan. 10, 2020, ECF No. 24-12.  On June 17, 2021, CSXT and GHL notified the STB that they had reached a trail use agreement.  *See* Notice of Trail Use Agreement, ECF No. 35-1.  At a status conference to discuss the effect of the trail use agreement on Plaintiffs' pending motion for partial summary judgment (which addressed liability where there was *no trail use* agreement), the United States did not contest liability in light of the entry of a trail use agreement and Federal Circuit case law establishing the NITU as the government action.  *See* Tr. 5:1-12; 8:4-8 (Aug. 17, 2021), attached as Exhibit 1; *see also* Order, ECF No. 38 (granting partial summary judgment as of the date of the NITU).  GHL is a wholly owned CSXT subsidiary; it has never taken any steps to develop a public trail.

On January 27, 2023, the STB served a decision in the Abandonment Exemption proceeding involving the railroad corridor that is the subject of this litigation, STB Docket No. AB 55 (Sub-No. 794X), stating that the STB had received information obtained during the course of discovery in this litigation concerning the railbanked status of the line.  STB Decision of Jan. 27, 2023, ECF No. 65.  In that decision, the STB placed a copy of a letter received from the Department of Justice in the docket and ordered CSXT and GHL (the trail sponsor) to respond to the information in the DOJ Letter, and "at a minimum, explain whether, and if so

how, the Line is being used as a recreational or historic trail." STB Decision of January 27, 2023, at 2.

At a February 2023 status conference, the parties and the Court discussed the STB order. *See* Tr: 6:1-4 (Feb. 8, 2023), ECF No. 73, attached as Exhibit 2. The United States explained that if the STB took action that affected the status of the railroad line, such as by revoking the 2020 NITU, the United States might seek reconsideration of the Court's liability ruling as there would be "no NITU and trail use agreement effective under the Trails Act." *See* Ex. 2, Tr. 34:12-17; *see also id.* at 10:9-15; 12:1-13:10; 13:19-14:24. The Court correctly noted the United States had "no interest, at th[at] point, in upsetting the liability decision unless the STB comes forward with a decision that is inconsistent with the Government's concession." *Id.* at 23:17-25. The Court recognized that if the STB took action that affected the status of the Court's decision finding the United States liable for a permanent taking, the United States could file a motion for reconsideration or other similar filing, and "the Court will consider it." *Id.* at 35:13-25; *see also* Tr. 8:14-9:1 (July 7, 2023), ECF No. 94, attached as Exhibit 3.

On November 14, 2023, the STB revoked the 2020 NITU underlying the claims in this case. STB Decision of Nov. 14, 2023, ECF No. 133-1. The STB's order authorized CSXT to abandon the line, providing 60 days to do so. *Id.* It also noted that the City of St. Petersburg could "submit a renewed request for a NITU authorizing interim trail use/rail banking negotiations between it and CSXT;" however, if CSXT agreed to negotiate trail use, CSXT would be required to explain why the adjacent landowner's continued occupation of the right-of-way would not interfere with future trail use. *Id.* at n.9 and n.13.

The City of St. Petersburg submitted a renewed request for a NITU on December 14, 2023, *see* ECF No. 151-1, and CSXT submitted a reply agreeing to negotiate with the City on

December 20, 2023, *see* ECF No. 161-1.[1]  On January 12, 2024, the STB issued a NITU (the "2024 NITU") to CSXT and the City of St. Petersburg giving them one year to negotiate a trail use agreement, *i.e.*, until January 12, 2025.  *See* STB Decision of Jan. 12, 2024, ECF No. 166-1.  If no agreement is reached, CSXT may fully abandon the line.  *Id.* at 4.

## STANDARD OF REVIEW

The Rules of this Court expressly recognize the Court's inherent power to reconsider interlocutory orders.  RCFC 54(b) provides that:

> [A]ny order or other decision, however designated, that adjudicated fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Similarly, RCFC 59(a)(1)(C) provides that the Court may grant reconsideration, "upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States."

Courts consistently recognize their authority to reconsider prior rulings before the entry of a final judgment.  *See, e.g.*, *Land Grantors in Henderson, Union & Webster Ctys. v. United States*, 71 Fed. Cl. 614, 621 (2006); *Marconi Wireless Tel. Co. of Am. v. United States*, 320 U.S. 1, 47-48 (1943) (holding that the trial court had power "at any time prior to entry of its final judgment . . . to reconsider any portion of its decision and reopen any part of the case." (citations omitted)), *superseded by statute on other grounds as stated in Allen Archery, Inc. v Jennings Compound Bow, Inc.*, 686 F,2d 780 (9th Cir. 1982); *Wolfchild v. United States*, 68 Fed. Cl. 779, 785 (2005) ("At an interlocutory stage, the common law provides that the court has power to

---

[1]  Despite agreeing to negotiate trail use with the City of St. Petersburg, CSXT has petitioned the Eleventh Circuit for review of the STB's November 14, 2023 decision revoking the NITU issued to CSXT and its subsidiary, GHL.  *See* ECF No. 140-1.

5

reconsider its prior decision on any ground consonant with application of the law of the case doctrine." (citations omitted)); *Fla. Power & Light Co. v. United States*, 66 Fed. Cl. 93, 96 (2005) ("[c]ourts possess inherent power to modify their interlocutory orders before entering a final judgment." (citations omitted)).

"The standard for reconsideration of an interlocutory order under RCFC 54(b) and 59(a)(1) have been described as less 'rigorous' than those, for example, applicable to final judgments under RCFC 59(e)." *Martin v. United States*, 101 Fed. Cl. 664, 670-71 (2011) (citing *Wolfchild*, 68 Fed. Cl. at 784), *aff'd sub nom. Fournier v. United States*, Nos. 2012-5056, 2012-5057, 2012-5071, 2012 WL 6839784 (Fed. Cir. Nov. 27, 2012). Reconsideration under RCFC 54(b) "is available as justice requires." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 48 (2011) (citations and internal quotation marks omitted). This standard requires consideration of whether the Court "has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or *where a controlling or significant change in the law or facts* [has occurred] since the submission of the issue to the court." *Id*. at 49 (quoting *Potts v. Howard Univ. Hosp.*, 623 F. Supp. 2d 68, 71 (D.D.C. 2009)) (emphasis added).

Reconsideration is also consistent with the law-of-the-case doctrine. *McGowan v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 734, 737 (1994) ("The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions. The court may change any interlocutory decision up until the entry of final judgment." (citations omitted)).

## ARGUMENT

Justice requires reconsideration of the Court's August 19, 2021 opinion finding the United States liable for a permanent taking based on the 2020 NITU. A "temporary taking

occurs when what would otherwise be a permanent taking is temporally cut short." *Seiber v. United States,* 364 F.3d 1356, 1364 (Fed. Cir. 2004) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001)). Here, the 2020 NITU— the government action on which the Court's finding was based—was revoked by the STB. That "cut short" any taking premised on the Trails Act, making the alleged taking temporary. *See, e.g. First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 319 (1987) (where government abandons a taking it becomes temporary); *Seiber,* 364 F.3d at 1364; *Wyatt*, 271 F.3d at 1097 n.6.

The temporary character of the taking before the Court is not altered by the 2024 NITU. No claim based on the 2024 NITU is pending. And the 2024 NITU merely authorizes CSXT and the City of St. Petersburg to engage in trail use negotiations; it has not changed the status quo. Furthermore, the fact that CSXT chose not to abandon the rail line when given a renewed opportunity in late 2023 should refute any claim that the new NITU caused a delay in abandonment.

Accordingly, the Court should grant the United States motion for reconsideration and vacate its ruling that the 2020 NITU effected a permanent taking.

I. **A NITU Is the Only Government Action That Can Provide the Basis for a Taking Claim in Trails Act Cases**

The NITU is the "government action that prevents the landowners from possession of their property unencumbered by the easement" and therefore establishes the only basis for a landowners' taking claim pursuant to the Fifth Amendment of the Constitution. *Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010); *see also Caldwell*, 391 F.3d at 1233-34 ("The issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interest

in the right-of-way."); *Barclay,* 443 F.3d at 1374 ("The NITU barred the abandonment; abandonment cannot occur after issuance of a NITU while the NITU is in effect. The barrier to reversion is the NITU, not physical ouster from possession."); *Memmer v. United States*, 50 F.4th 136, 146 (Fed. Cir. 2022) (finding that taking ended upon expiration of the NITU "because it was on that date that the United States was no longer responsible for mandating the continuation of the easement"); *Balagna v. United States*, 145 Fed. Cl. 442, 444 (2019) ("Therefore, the taking effected by the NITU's issuance ends upon the NITU's expiration."); *Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) ("The STB's issuance of a NITU forestalls the full abandonment of the railroad line, and therefore constitutes the government action that prevents the landowners from possession of their property unencumbered by the easement.") (internal quotation marks and citation omitted).

There are "several possible outcomes" when a NITU is issued – either "temporary or permanent takings" are possible. *Caldwell*, 391 F.3d at 1234, 1235. "It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues." *Id.* at 1234. But generally, when a trail use agreement is reached, the taking will be permanent. *Id.* (noting that the NITU may "trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked."); *see also Balagna v. United States,* 138 Fed. Cl. 398, 404 (2018) ("Thus, if a trail use agreement is eventually reached, the NITU remains in effect indefinitely, effecting a permanent taking.") (internal quotation marks and citation omitted). Where no trail use agreement is reached, the taking, if any, will be temporary. *See Caldwell*, 391 F.3d at 1234; *see also Ladd*, 630 F.3d at 1025; *Balagna*, 138 Fed. Cl. at 404 ("On the other hand, where negotiations end

without an agreement being reached, the government's interference with the landowner's reversionary interest is for a finite period of time.").

Where a NITU ends because it expires, is revoked, or is otherwise extinguished, any taking necessarily ends.  *See Memmer v. United States*, 50 F.4th 136, 146 (Fed. Cir. 2022) ("We agree with the government that the taking ended upon expiration of the NITU. . . .  This is so because it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of [the railroad]."); *Caldwell*, 391 F.3d at 1235 (the government may decide to abandon taking, which "results in an alteration in the property interest taken—from full ownership to one of temporary use and occupation"); *see also Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002) (If "the government reconsiders the earlier denial and grants a permit (or revokes the permitting requirement), then the aggrieved party can seek compensation for a temporary . . . taking.").

## II. Any Taking Based on the 2020 NITU Is—At Most—Temporary

It is well-established that a "temporary taking occurs when what would otherwise be a permanent taking is temporally cut short." *Seiber,* 364 F.3d at 1364; *Wyatt*, 271 F.3d at 1097 n.6; *see also First English*, 482 U.S. at 318 ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable.") (quoting *San Diego Gas & Electric Co.*, 450 U.S. 621, 657 (1981) (Brennan, J., dissenting)).  Temporary takings arise in a wide variety of circumstances:  "when a court invalidates a regulation that had previously effected a taking, when the government elects to discontinue regulations after a taking has occurred, or when the government denies a permit and at some later point reconsiders the earlier denial and grants a permit (or revokes the permitting requirement)." *Seiber*, 364 F.3d 1364 (cleaned up).  The

"essential element" for a taking to be temporary "is a finite start and end." *Id.* (quoting *Wyatt*, 271 F.3d at 1097).

Here, after a trail use agreement was reached, this Court entered partial summary judgment finding that "the government is liable for a permanent taking of the property at issue as of the date of the [2020] NITU". Order at 1, ECF No. 38 (Aug. 19, 2021). However, now that the STB has revoked the 2020 NITU, the situation has changed. The STB "cut short" the government action that authorized interim trail use, giving the taking a "finite start and end." *See Seiber*, 364 F.3d at 1364. Accordingly, the Court should reconsider and vacate its ruling that the 2020 NITU led to a permanent taking.

Plaintiffs may argue that it would be inappropriate or improper to allow the STB to cut short the taking of Plaintiffs' property and thus reduce the compensation owed. The Supreme Court spoke to such an argument in *First English*: "This Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations." 482 U.S. at 317 (citing *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984), and *United States v. Dow*, 357 U.S. 17, 26 (1958)). Moreover, when it does, "the landowner has no right under the Just Compensation Clause to insist that a 'temporary' taking be deemed a permanent taking." *Id.* Consequently, here, because the STB "abandoned the intrusion" by revoking the 2020 NITU, neither Plaintiffs nor the Court can insist that the government effected a permanent taking. In other words, this Court must reconsider its liability ruling.

It is immaterial that CSXT and GHL entered into a trail use agreement pursuant to the now-revoked NITU. The trail use agreement—a contract between the railroad and its

10

subsidiary—cannot substitute as the basis for a taking in the absence of a NITU.[2] *Caldwell*, 391 F.3d at 1233-34. As explained above, the NITU is the *only* government action that can provide a basis for a taking claim. And in any event the trail use agreement has now been nullified.[3]

Because the government action authorizing interim trail use was merely temporary in duration, if the facts of the case otherwise support a determination of liability,[4] any taking is temporary. *See Memmer*, 50 F.4th at 146; *Caldwell*, 391 F.3d at 1234.

### III. No Taking Claim Based on the 2024 NITU Is Before the Court and Any Such Claim Would be Temporary in Nature in Any Event

The STB issued a new NITU earlier this month on January 12, 2024. Unsurprisingly, no claim based on the 2024 NITU was pled, no discovery about such a hypothetical claim has been taken, and the Court has made no liability finding with respect to the 2024 NITU. In short, the

---

[2] Plaintiffs are not parties to the trail use agreement and, consequently, lack standing to object to the agreement's nullification by the STB. It would also be odd. Plaintiffs' complaint is that the 2020 NITU caused their property to be burdened by a new easement for interim trail use. That burden has now been lifted.

[3] The trail use agreement is a contract governed by state law. Plenary federal authority over railroad abandonment was established by Congress 100 years ago in the Transportation Act of 1920, ch. 91, 41 Stat. 456 (1920). In 1981, the Supreme Court made clear that the Interstate Commerce Act, as amended by the Transportation Act of 1920, preempted state law on abandonment due to the federal law's pervasive and comprehensive regulatory scheme. *Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318 (1981). The trail use agreement between CSXT and GHL has no force without the STB's authorization, which was revoked.

[4] The Federal Circuit has held in the context of temporary takings that "in order to determine if a NITU has effected a taking, we must consider whether the railroad would have abandoned the line, *i.e.*, relinquished its rights to the rail right-of-way, during the period of the NITU had there been no NITU." *Memmer*, 50 F.4th at 145 (citing *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020)). Neither the parties nor the Court have analyzed the "causation" element applying to temporary takings.

2024 NITU is not a part of this case and should have no bearing on this motion or the upcoming trial.[5]

Additionally, the 2024 NITU gives CSXT and the City of St. Petersburg until January 12, 2025, to attempt to negotiate a trail agreement.[6] It thus has a finite end, meaning it cannot at this juncture support a permanent taking claim. Any taking, assuming the causation requirement in *Caquelin* could be satisfied, would be temporary.

## IV. The Distinction Between Temporary and Permanent Takings Has Significant Ramifications for the Court's Just Compensation Analysis

The focus of any just compensation inquiry in a Fifth Amendment takings case is "the value of what [the landowner] has been deprived of, and no more." *Bauman v. Ross*, 167 U.S. 548, 574 (1897). The property right taken—that is "what [the landowner] has been deprived of"—is the foundational element of this determination. *Id.*

Binding precedent holds that the proper measure of just compensation for a temporary taking is the market rental value of the property for the period of the taking. *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1580–81 (Fed. Cir. 1990). Just compensation for a permanent taking is normally measured by the diminution of market value of the property taken, or "what a willing buyer would pay to a willing seller for the property." *United States v. 50 Acres of Land*, 469 U.S. 24, 29 & n.1 (1984); *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987).

---

[5] The 2024 NITU does underscores that any trail use agreement made pursuant to the authority granted in the original 2020 NITU is null and void. If the trail use agreement between CSXT and GHL were still in force, CSXT would have no authority to negotiate a trail use agreement with the City of St. Petersburg.

[6] It is impossible to know whether these negotiations will culminate in a new trail use agreement. The history of unsuccessful negotiations between these two parties, and CSXT's unwillingness to negotiate with the City of St. Petersburg in the recent past, gives ample reason to doubt the likelihood of success.

12

Plaintiffs apparently intend to demand compensation for a permanent taking despite being cautioned by the United States that the ground has shifted. Plaintiffs are insisting on moving to trial immediately, successfully opposing the motion the United States filed to vacate the trial schedule to enable the parties to procure the expert analyses needed in a temporary taking case. Plaintiffs are free to make such a choice. But that choice has consequences. Plaintiffs have served no expert reports and conducted no expert analysis of the fair market rental value of their respective properties. By moving forward now, Plaintiffs are making the conscious decision to present no evidence of just compensation for a temporary taking. And without such evidence, if either this Court or the Federal Circuit finds no permanent taking, the Court will lack "sufficient reliable proof" as to the market rental value "to independently determine a damages award," meaning Plaintiffs will be entitled to no compensation. *Gadsden Industrial Park, LLC v. United States*, 956 F.3d 1362, 1372 (Fed. Cir. 2020) (affirming a trial court award of zero dollars where plaintiff failed to offer sufficient evidence of market value).

## **CONCLUSION**

The taking of Plaintiffs' properties ended when the STB revoked the 2020 NITU. Plaintiffs have "no right under the Just Compensation Clause to insist that [what is now] a 'temporary' taking be deemed a permanent taking." *First English*, 482 U.S. at 317. Accordingly, as explained above, the United States respectfully requests that the Court grant its motion for reconsideration and vacate the ruling that the 2020 NITU effected a permanent taking.

Respectfully submitted this 19th day of January 2024,

TODD KIM
Assistant Attorney General

13

United States Department of Justice
Environment & Natural Resources Division

*/s/ Frances B. Morris*
FRANCES B. MORRIS
SAMANTHA G. PELTZ
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel:  202-514-2855
Fax:  202-305-0506
E-Mail:  frances.morris@usdoj.gov

*Attorneys for Defendant United States*